UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


UNITED STATES OF AMERICA                    CRIMINAL ACTION

v.                                          NO. 12-001

WALTER PORTER, ET AL.                       SECTION "F"


ORDER AND REASONS

Before the Court are three motions: (1) motion to change venue
pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure
by Walter Porter, Nakia Hankton, Shirley Hankton, Telly Hankton,
Thomas Hankton, Troy Hankton, George Jackson, Kevin Jackson,
Derrick Smothers, and Terrell Smothers; (2) motion to vacate the
December 7, 2012 anonymous jury order by Walter Porter, Nakia
Hankton, Shirley Hankton, Telly Hankton, Thomas Hankton, Troy
Hankton, George Jackson, Kevin Jackson, Derrick Smothers, and
Terrell Smothers; and (3) motion for attorney-conducted individual
voir dire by Walter Porter, Andre Hankton, Nakia Hankton, Shirley
Hankton, Telly Hankton, Thomas Hankton, Troy Hankton, Kevin
Jackson, Derrick Smothers, and Terrell Smothers.[1]  For the reasons

_____

[1] There is some discrepancy in the docket as to how many defendants
join in this motion.   The motion names Walter Porter, Andre
Hankton, Nakia Hankton, Shirley Hankton, Telly Hankton, Thomas
Hankton, Troy Hankton, Kevin Jackson, Derrick Smothers, and Terrell

1

that follow, the motion to vacate anonymous jury order is DENIED and the motions to change venue and for attorney-conducted individual voir dire are DENIED without prejudice.

## Background

On June 19, 2014, a federal grand jury returned a 24-count third superseding indictment, charging 13 defendants[2] with violations of federal criminal laws.  The charges include: RICO conspiracy, in violation of 18 U.S.C. § 1962(d);[3] conspiracy to distribute drugs (crack, powder cocaine, heroin, and marijuana), in violation of 21 U.S.C. § 846; conspiracy to possess firearms, in violation of 18 U.S.C. § 924(o); conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k); five counts of murder in aid of

---

Smothers.  But the docket sheet suggests the motion is filed on behalf of all 13 defendants (including those already listed as well as George Jackson, Netthany Schexnayder, and Sana Johnson). Regardless, a ruling on this issue applies to all defendants.

[2] The 13 defendants charged in the third superseding indictment are Walter Porter a/k/a "Urkel" a/k/a "Moonie"; Andre Hankton a/k/a "Reese"; Nakia Hankton; Shirley Hankton; Telly Hankton a/k/a "Third" a/k/a "Wild" a/k/a "Red"; Thomas Hankton a/k/a "Squirt"; Troy Hankton; George Jackson a/k/a "Black"; Kevin Jackson a/k/a "Kev"; Netthany Schexnayder; Derrick Smothers a/k/a "Dump"; Terrell Smothers; and Sana Johnson.

[3]  The third superseding indictment charges that, beginning on a date unknown, but prior to January 1996, and continuing to the date of the third superseding indictment, various defendants were part of a criminal enterprise that historically encompassed the Uptown Central City area of New Orleans, primarily concentrated in the area bordered by Jackson Avenue, St. Andrew Street, Simon Bolivar Avenue, and Oretha Castle Haley Boulevard. Notably, the indictment alleges 101 overt acts that were committed by the defendants in furtherance of the conspiracy and to accomplish the objects of the conspiracy.

racketeering, and aiding and abetting, in violation of 18 U.S.C. §§ 1959(a)(1) and 2; six counts of causing death through the use of a firearm, and aiding and abetting, in violation of 18 U.S.C. §§ 924(j)(1) and 2; possession of a short-barreled shotgun, in violation of 26 U.S.C. § 5861(d) and 5871; three counts of felon in possession of a firearm, and aiding and abetting, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2; assault with a dangerous weapon in aid of racketeering and aiding and abetting, in violation of 18 U.S.C. §§ 1959(a)(3) and 2; using and carrying a firearm during and in relation to a crime of violence and drug trafficking crime and aiding and abetting, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; conspiracy to commit misprision of a felony, in violation of 18 U.S.C. § 371; accessory after the fact to murder, in violation of 18 U.S.C. § 3; money laundering conspiracy, in violation of 18 U.S.C. § 1956(h); and, finally, perjury, in violation of 18 U.S.C. § 1623.

This Order and Reasons assumes familiarity with the charges and the procedural history of the case. Most of the defendants now urge the Court to change the venue of the June 6, 2016 criminal trial, vacate the Court's December 7, 2012 anonymous jury order, and permit attorney-conducted individual voir dire. Each of these motions focus a universal mandate of all criminal trials: empaneling a fair and impartial jury.

I.
Motion to Change Venue

*A.*

Ten out of thirteen defendants move to change the venue of the criminal trial scheduled for June 6, 2016 on the ground that the impact on public perception by the persistent, negative scrutiny and the mythical portrayal of Telly Hankton by the media undermines the defendants' due process rights, in particular, their ability to empanel an impartial jury.  They point to numerous press accounts of Telly Hankton's alleged crimes and reputation;[4] observations by

---

[4] Although defendants attach hundreds of articles to their memorandum in support of their motion to change venue, the Court samples only a few featured by defendants:

- "Local schoolchildren tell tall tales of Telly Hankton as if he were a minion of the mythical lord of the underworld, Pluto.  Just looking at the murders with which he has been charged is enough to result in nightmares."
- "New evidence should mean new trial, says many convicted in 2006 Central City massacre."
- Telly Hankton, the alleged Uptown crime kingpin, convicted murderer and police poster child for New Orleans' struggles with street violence, apparently has lost his financial muscle while holed up in prison."
- "Hankton Must Stay in Angola – He's Too Dangerous for Jail, Judge Says."
- "Hankton's alleged exploits as Uptown drug mogul, shot-caller and merciless killer with a loyal and lawless posse had reached epic gangland status."  The article compared Telly Hankton to the fictional cinema gangster, Keyser Soze from the 1995 film Usual Suspects.
- The October 2012 "Lethal Connections" story, which included a detailed graphic expressing the alleged connections around Telly Hankton, including many of the defendants.

this Court about media coverage;[5] publication of an artistic mosaic likeness of Telly Hankton created out of 14,000 spent bullet casings by a New Orleans Police Department homicide detective;[6] as well as a "reportedly" highly potent daiquiri bearing the Telly Hankton moniker served at a St. Charles Avenue daiquiri shop.

These defendants submit that the saturation of Telly Hankton's image -- the personification of New Orleans "most dangerous" gangster -- so poisons the Eastern District of Louisiana well as to make it impossible to obtain an impartial jury comprised of individuals who have not pre-judged the defendants based upon what they have seen, read, or drunk about Telly Hankton.[7]   The government counters that this is not an extreme case in which a

---

[5] On December 7, 2012, this Court observed that "The media has already begun to dramatize this case and the charges against the defendants.   Although this case is still in a relatively early stage, it has received considerable press coverage on a local and national level, perhaps in part because the Mayor of New Orleans, Mitch Landrieu, has publicly labeled Telly Hankton as 'New Orleans' Most Dangerous' in press conferences."   Order and Reasons dated 12/7/12.

[6] The accompanying article explains that the artist "intends the masterful mosaic titled 'The Ghost of Telly Hankton,' not as a glorification of Hankton, but as a tribute to the police department that brought his reign of terror to a halt."   During the oral hearing, defense counsel underscored the local New Orleans paper's editorial content as perpetuating the Hankton "brand of violence and fear."

[7] During the oral hearing, defense counsel offered what this Court considers an impractical solution to what at this point is a more abstract notion of presumptive prejudice: to transfer venue for the purposes of voir dire, and then transfer the venue back to this District for the trial.

presumption of prejudice resulting from media attention makes it impossible to obtain an impartial jury.  Without some showing regarding the effect of the allegedly pervasive publicity on the entire venire (rather than merely Orleans Parish bubble), the government submits, the defendants' motion must fail.[8]  Even if this was an extreme case in which the Court must presume prejudice from extensive prejudicial pretrial publicity, the government points out, any presumption of prejudice can be rebutted by a showing that the trial court's voir dire successfully identified bias and actually empaneled an impartial jury.

*B.*

The U.S. Constitution mandates that criminal trials "shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3.  Likewise, the Sixth Amendment speaks to venue for criminal trials, guaranteeing to criminal defendants the right to trial "by an impartial jury of the State and district wherein the crime shall have been committed."  Id. amend. VI.[9]  The U.S. Supreme Court nevertheless has observed that when a defendant's due process right to a fair trial by an

---

[8] The government points out that two impartial juries were empaneled in Orleans Parish during Telly Hankton's two state court criminal trials.  The defendants counter that the media reports of the circumstances and results of those trials bolster their presumptive prejudice argument.

[9] Similarly, Rule 18 of the Federal Rules of Criminal Procedure obliges the government to "prosecute an offense in a district where the offense was committed."  Fed. R. Cr. P. 18.

impartial jury will be undermined by these venue requirements, these constitutional "place-of-trial prescriptions . . . do not impede transfer . . . to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial." <u>Skilling v. United States</u>, 561 U.S. 358, 378 (2010). The key to venue change on grounds of presumptive prejudice is that it must be "extraordinary."

Rule 21 of the Federal Rules of Criminal Procedure provides that the Court "must transfer the proceeding . . . to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Cr. P. 21(a).[10] At this stage of the proceedings, the Court is not persuaded, and therefore will not presume, that these defendants cannot obtain a fair and impartial trial in the Eastern District of Louisiana.

Where, as here, the defendants invoke presumptive prejudice, <u>Skilling</u> controls. There, the Supreme Court intentionally underscored that the sort of prejudice warranting venue transfer is

---

[10] Subsection (b) of Rule 21 provides that the Court "may" also transfer a criminal proceeding for convenience. Fed. R. Cr. P. 21(b). An issue not raised here. To the contrary, the government submits that insofar as convenience is considered, it weighs heavily against transfer, given that almost all of the government's 100 witnesses are located in Orleans Parish of the surrounding parishes and that transportation and security is already being arranged for the incarcerated witnesses.

only presumed in the most extreme cases.  Jeffrey Skilling -- who,
from the time he was hired in 1990 until he left Enron Corporation[11]
in 2001, had risen through the corporate ranks to Chief Executive
Officer of Enron -- was prosecuted for crimes committed before
Enron's collapse into bankruptcy.  561 U.S. at 368.

After Skilling was charged in federal court in Houston with
conspiracy to commit securities and wire fraud, as well as 25
substantive counts of securities fraud, wire fraud, making false
representations to Enron's auditors, and insider trading, he
requested that his case be moved to another district based on the
widespread pretrial publicity and the general hostility toward him
in the Houston area.  Id. at 369.  The district court denied his
motion.  The Fifth Circuit affirmed,[12] and the Supreme Court agreed
that, notwithstanding that Skilling was universally despised, the
district court "did not exceed constitutional limitations" in
denying the motion to change venue, holding that Skilling failed to

---

[11] Enron, which was headquartered in Houston, Texas, grew into one
of the world's leading energy companies.  By 2001, Enron was the
seventh highest revenue grossing company in America; its stock was
trading at $90 per share in August 2000.  But it plummeted to
pennies per share in late 2001.

[12] As the Supreme Court noted, the Fifth Circuit "initially
determined that the volume and negative tone of media coverage
generated by Enron's collapse created a presumption of juror
prejudice." Id. at 375-76 (citing 554 F.3d 529, 559 (2009)).  But,
after examining the voir dire to determine whether the district
court empaneled an impartial jury, the Fifth Circuit ultimately
found that the presumption of prejudice was, in fact, rebutted, and
that Skilling had not "shown[n] that any juror who actually sat was
prejudiced against him." Id. at 376.

"establish that a presumption of juror prejudice arose or that actual bias infected the jury that tried him."  Id. at 368.

In so holding, the Supreme Court identified four factors relevant to determining whether a defendant had demonstrated the requisite presumption of prejudice warranting venue transfer: (1) "the size and characteristics of the community in which the crime occurred" and from which the jury would be drawn; (2) the quantity and nature of media coverage about the defendant and the crime, whether the news stories contained "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight", such as a videotaped confession; (3) the passage of time between the alleged crime and the trial, whether "the decibel level of media attention diminished" in that time; and (4) in hindsight, an evaluation of the trial outcome, whether the jury's verdict ultimately undermined any possible pretrial presumption of prejudice.  Id. at 381-85.

Guided by these factors, this Court finds that this case, like Skilling, "shares little in common with those in which [the Supreme Court] approved a presumption of juror prejudice."  Id. at 384. First, the Eastern District of Louisiana draws from a large and diverse community of 13 parishes, including Orleans Parish.[13]

---

[13] That an impartial jury was seated twice in Orleans Parish to try Telly Hankton for the murder of Darnell Stewart in state court is worth noting.  Here, the Eastern District of Louisiana jury pool is considerably larger and made up of communities that were not impacted by the charged conduct.

Orleans Parish has a population of 360,740 residents and nearby Jefferson and St. Tammany Parishes have populations of 432,640 and 236,785, respectively.   Considering the quantity and nature of media coverage, there is no evidence in the record of the degree of overall community exposure to the local New Orleans news articles. The Court does not simply assume that all potential jurors in all 13 parishes have been exposed to the newspaper articles and internet newspaper postings from local New Orleans-based media outlets.   That this District is comprised of 13 parishes and over 1.6 million people certainly dilutes any media impact and reduces any likelihood of prejudice.[14]

Assuming some exposure just based on the sheer number of articles published in the Times-Picayune or online on nola.com, as well as any reports by other news sources echoing the local pieces, a showing of "widespread publicity" is not sufficient to warrant a change of venue.   See United States v. Parker, 877 F.2d 327, 330 (5th Cir. 1989).   Moreover, the Court notes that the press coverage has been mostly fact-based reporting on charges and events, although many of the charges (including murders, including alleged revenge killings, as well as disrespect for or interference with the judicial process) lend themselves to sensationalism.   Even assuming that fact-based reporting on murder charges could in

---

[14] The U.S. Census Bureau for 2011 indicates that the parishes comprising this District have a population of 1,614,274 residents.

10

isolation be considered adverse publicity, the defendants fail to persuade in the abstract that this is an extreme case where prejudice must be presumed and the venue changed.   Indeed, the prospect of seating an unbiased jury in the Eastern District of Louisiana is hardly remote; the defendants fail to point to any highly publicized criminal trial in the Eastern District -- and in recent history, there have been several[15] -- where the Court was unable to impanel a fair and impartial jury.   See Skilling, 561 U.S. at 384 ("pretrial publicity -- even pervasive, adverse publicity -- does not inevitably lead to an unfair trial.")(citation omitted).[16]   This is so because "[j]urors . . .

---

[15] These include the trials of former Mayor Ray Nagin, the Danziger Bridge defendants, the police officer defendants charged in the burning of Henry Glover's body, as well as the trials of Mose Jefferson, Mark St. Pierre, and Renee Gill Pratt.   In a notable out-of-district case, a request for change of venue by Dzhokhar Tsarnaev -- the so-called Boston Marathon Bomber -- was also denied.

[16] Unlike a circus-like trial atmosphere (which this Court will not tolerate), or the blatant prejudice inherent in broadcasting a police-interrogated taped confession to bank robbery and murder imminently before the trial was held in a small town criminal case, where the Supreme Court has presumed prejudice, no such circumstances are present here.
     In Skilling, the Court distinguishes three cases in which it approved a presumption of juror prejudice and overturned convictions "corrupted by press coverage," Rideau v. Louisiana, 373 U.S. 723 (1963), Estes v. Texas, 381 U.S. 532, 538 (1965), and Sheppard v. Maxwell, 384 U.S. 333 (1966).   Rideau was charged with robbing a bank in a small Louisiana town (in a parish with a population of 150,000 people), kidnaping three bank employees, and killing one of them. Police interrogated Rideau in custody without counsel present, and he confessed. Skilling, 561 U.S. at 379 (citation omitted).   The police, without Rideau's consent or knowledge, had filmed the confession, which was then, shortly

need not enter the box with empty heads in order to determine the facts impartially." Id. at 398. ("It is sufficient if the juror[s] can lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court.")(citation omitted). Any potential for prejudice will be cured by the use of a jury questionnaire combined with extensive follow-up voir dire. Indeed, counsel are working together with the Court to prepare a jury questionnaire to be completed by potential members of the jury pool. The Court is confident that the information obtained from these screening questionnaires, as well as follow up voir dire, will result in empaneling an impartial jury.[17]

Considering the time that has elapsed between the charged crimes and the trial itself also supports denial of the defendants' motion to change venue. Certainly the media continues to report on

---

before trial, broadcast three times to audiences ranging from 24,000 to 53,000 people. After the trial court denied Rideau's motion to transfer venue, a jury convicted him, and the state supreme court upheld the conviction. The U.S. Supreme Court reversed, finding that "[t]he "'kangaroo court proceedings' trailing the televised confession violated due process." Id. at 380 ("[T]o the tens of thousands of people who saw and heard [the confession]," the Court explained, the interrogation "in a very real sense was Rideau's trial – at which he pleaded guilty."). "Rideau's dramatically staged admission of guilt, was likely imprinted indelibly in the mind of anyone who watched it." Id. at 382-83. Estes and Sheppard "involved media interference with courtroom proceedings during trial." Id. at 382 n.14 (emphasis in original).

[17] Of course, if it turns out that virtually every potential juror is biased against these defendants based on the media coverage, then the Court would revisit this extraordinary option of venue change.

this case and likely will do so as a result of the Court's hearing on these and future motions and, ultimately, the trial itself.  But the amount and intensity of reporting on Telly Hankton and his family and those linked to him has diminished over the years. Significantly, more than three years will have elapsed between the last of the major crimes alleged in the superseding indictment and the June 2016 trial.[18]   Again, answers to jury questionnaires followed by extensive voir dire will allow a realistic assessment of whether there has been such extreme prejudice as to corrupt and disqualify the entire Eastern District of Louisiana venire.[19]   On this record, however, the defendants ask the Court to speculate; they defendants have failed to persuade the Court that prejudice must be presumed.

## II.
### Motion to Vacate Anonymous Jury Order

#### A.

Applying <u>United States v. Krout</u>, 66 F.3d 1420 (5th Cir. 1995),

---

[18]  The government submits these facts. Darnell Stewart was shot on May 13, 2008, Telly Hankton posted a $1,000,000 bond and then fled Orleans Parish that same summer.  Jesse Reed was murdered in June 2009, Hasan Williams was killed in July 2009.  J.M. was shot in October 2010.  In the summer of 2011, the perjury scheme led to a mistrial in Telly Hankton's first trial for the murder of Darnell Stewart.  Telly Hankton was retried, convicted, and sentenced to life in prison in the fall of 2011.  Curtis Matthews was shot in October 2011.

[19]  Of course, at this pretrial stage the Court cannot consider hindsight-driven factor 4.

the Court thoroughly outlined the reasons supporting its *sua sponte* decision to empanel an anonymous jury.   Order and Reasons dated 12/07/12.  Ten of thirteen defendants now challenge that ruling and urge the Court to vacate the anonymous jury order, citing the concerns the Court already considered when it issued its order. First, they submit that an anonymous jury -- "a device of last resort", Krout, 66 F.3d at 1427 -- is neither necessary nor justified.  The defendants contend that the Court erred when it based its review of the Krout factors primarily on the government's allegations in the indictment, rather than on actual fact-findings. The defendants also submit that the Krout factors do not weigh in favor of an anonymous jury because there is no basis for concluding that the defendants (a) are associated with ongoing organized crime, (b) have the present capacity to harm jurors, or (c) that they have in the past interfered with the judicial process. Second, the defendants submit that an anonymous jury would be highly prejudicial to the defendants' presumption of innocence as well as their ability to intelligently engage in the voir dire process.  Such submissions are a betrayal of the dynamics of the charges in which this case is brought to Court.

The government counters that, although a court's decision to order an anonymous jury should be based on "more than mere allegations", Krout recognizes that "evidence at trial can support the conclusion that anonymity was warranted."  Id. (citing United

14

States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994)).  Given the implication of the Krout factors, including defendants' past history of allegedly obstructing justice in multiple forums,[20] the government correctly submits that there is strong reason to believe that the jury needs protection, and that the Court can fashion reasonable precautionary measures to minimize any potential prejudice.  (Not the first time an anonymous jury has been used in this federal district.)[21]

*B.*

Selection of an anonymous jury continues to be appropriate in this case.  The reasons articulated in the December 7, 2012 Order and Reasons remain valid and need not be reproduced here.  Suffice it to say, consistent with the case literature, the Court determined that the totality of the circumstances necessitates the use of an anonymous jury.[22]

---

[20] The government makes unusually fact-specific obstruction of justice charges regarding some defendants.

[21] For example, Judge Clement twice empaneled anonymous juries, once in this District, United States v. Carollo, 1995 WL 591322 (E.D. La. Aug. 28, 1995), and affirmed by the Fifth Circuit in United States v. Salvatore, 110 F.3d 1131, 143-44 (5th Cir. 1997), *abrogated in part on other grounds by*, Cleveland v. United States, 531 U.S. 12 (2000); Judge Clement again empaneled an anonymous jury while presiding over a Middle District case, in which the Fifth Circuit affirmed at United States v. Brown, 303 F.3d 582 (5th Cir. 2002).

[22] Notably, the Court found that each of the five Krout factors was implicated: first (defendants' alleged involvement in organized crime), second (defendants' participation in a group with the capacity to harm jurors), third (defendants' past attempts to

15

The defendants fail to persuade that the Court erred in its application of the Krout factors.  Likewise, the defendants fail to persuade that the potential for prejudice obliges the Court to vacate the anonymous jury procedure.  The Court has already considered, and indeed, shares, the defendants' concerns that an impartial jury be selected, one that will maintain defendants' presumption of innocence throughout the trial; and the Court will scrupulously protect each defendant's right to a fair trial.  In pursuit of this common goal, the Court will take all precautionary steps necessary to insure that an impartial jury is selected; one that will presume innocence throughout the trial.  Information gleaned from extensive juror questionnaires (questionnaires crafted by counsel) will be provided to counsel, careful voir dire will follow to uncover any potential bias, and a neutral explanation[23]

---

interfere with the judicial process and to intimidate witnesses), fourth (the potential that, if convicted, defendants suffer lengthy incarceration and substantial monetary penalties), and fifth (the likelihood of extensive publicity that could enhance the possibility that juror identity would become public and expose jurors to intimidation and harassment).

[23] The Fifth Circuit appears to endorse the Second Circuit's requirement that the trial court provide the jurors with a plausible neutral reason for not disclosing their identities, such as instructing prospective jurors that

> the reason for their anonymity is to maintain their personal privacy and their ability to render a fair verdict in light of the media and public attention that this trial is likely to receive.  The court will also instruct petit jurors that transportation [and lunch] are being provided to further protect their privacy and to ensure a timely start to each session of what the parties

and appropriate cautionary instructions will be provided.

III.

Motion for Attorney-Conducted Individual Voir Dire

*A.*

Pressing that this case involves prejudicial pretrial publicity, racial overtones, and allegations of gang association, another ten out of thirteen defendants -- Walter Porter, Andre Hankton, Nakia Hankton, Shirley Hankton, Telly Hankton, Thomas Hankton, Troy Hankton, Kevin Jackson, Derrick Smothers, and Terrell Smothers[24] -- move for attorney-conducted individual voir dire. These defendants submit that attorney-conducted voir dire will substantially increase the likelihood that any hidden prejudices of

_____

expect will be a lengthy trial.  Moreover, the court will emphasize that these are not unusual procedures.

See, e.g., United States v. Ashburn, No. 13-303, 2014 WL 5800280, at *18 (E.D. N.Y. Nov. 7, 2014)("the Second Circuit 'has repeatedly held that a defendant's presumption of innocence is properly maintained where the court gives a neutral and non-prejudicial explanation to the jury regarding the need for anonymity.'") (citations omitted); accord United States v. Riggio, 70 F.3d 336, 340 & n.23 (5th Cir. 1995)("Careful instructions were given to the jurors, explaining to them that the use of numbers instead of names was standard procedure in criminal cases.  This neutral explanation caused no unfair prejudice to [the defendant].").

[24] There is some discrepancy in the docket as to how many defendants join in this motion.  The motion names 10: Walter Porter, Andre Hankton, Nakia Hankton, Shirley Hankton, Telly Hankton, Thomas Hankton, Troy Hankton, Kevin Jackson, Derrick Smothers, and Terrell Smothers.  But the docket sheet suggests the motion is filed on behalf of all 13 defendants (including those already listed as well as George Jackson, Netthany Schexnayder, and Sana Johnson).

the jurors will be uncovered, will allow the attorneys to exercise sensitive and intelligent peremptory challenges, and will insure that an impartial jury is empaneled.  In particular, the defendants propose that the Court employ these procedures: (a) voir dire in its entirety should be attorney-conducted (or, if the Court conducts initial voir dire, counsel urges the Court to afford defense counsel a given amount of time within which to supplement the Court's inquiry of each individual juror); and (b) prospective jurors who have indicated in their response to the juror questionnaire that they have read or heard of this case should be questioned about their knowledge while on the witness stand and outside the presence of other jurors.

The government opposes the defendants' voir dire proposal, countering that this Court's usual practice (of conducting the voir dire and offering counsel an opportunity to submit additional questions for its consideration) suffices to protect the defendants' fair trial rights, particularly where as here the Court will first utilize a juror questionnaire.  The government submits that examination of each juror outside the presence of other prospective jurors is not required, particularly where, as here, jurors will have completed a detailed questionnaire.  Finally, the government suggests that the defendants' motion is premature; any decision regarding whether individual voir dire on the impact of any pretrial publicity should be made after the questionnaires

(which have yet to be finalized) are completed by prospective jurors and reviewed by counsel and the Court.

*B.*

"No hard-and-fast formula dictates the necessary depth or breadth of voir dire." <u>United States v. Skilling</u>, 561 U.S. 358, 386 (2010)(citing <u>United States v. Wood</u>, 299 U.S. 123, 145-146 (1936)("Impartiality is not a technical conception.  It is a state of mind.  For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula.")).  Indeed, "[j]ury selection . . . is 'particularly within the province of the trial judge.'" <u>Id.</u> (citations omitted). Rule 24 of the Federal Rules of Criminal Procedure implements the trial court's discretion and simply addresses the basic parameters for examining prospective jurors:

> **(a) Examination.**
> **(1) In General.**  The court may examine prospective jurors or may permit the attorneys for the parties to do so.
> **(2) Court Examination.** If the court examines the jurors, it must permit the attorneys for the parties to:
> (A) ask further questions that the court considers proper; or
> (B) submit further questions that the court may ask if it considers them proper.

Fed. R. Cr. P. 24(a).  This Court's usual practice is unqualifiedly in accord with Rule 24.  Typically, the Court initiates the voir dire process and invites special voir dire questions from counsel,

19

which it will ask or will permit counsel to ask as appropriate.  A process that has proved sufficient to reveal biased jurors for over 30 years.

"The district court has great latitude to conduct voir dire, including the form and scope of questioning." United States v. Pratt, 728 F.3d 463, 470 (5th Cir. 2013)(citations omitted). Although the Fifth Circuit has "resisted categorically requiring specific voir dire procedures or questions" and the court gives "great deference to the trial court's determination of impartiality," the Fifth Circuit has instructed that "a court may not rely solely on a juror's assertion of impartiality but instead must conduct a sufficiently probing inquiry to permit the court to reach its own conclusion." Id.

> Only when there is insufficient questioning to allow defense counsel to exercise a reasonably knowledgeable challenge to unqualified jurors does the district court abuse its discretion.  To demonstrate that questioning about pretrial publicity was inadequate, a defendant must show (1) that pretrial publicity about the case raised a significant possibility of prejudice, and (2) that the district court's voir dire procedure failed to provide a reasonable assurance that prejudice would be discovered if present.

Id. (internal quotations, citations, footnotes omitted).  The U.S. Supreme Court has held that a district court does not abuse its discretion in choosing to question potential jurors, rather than permitting the attorneys to pose questions.  Skilling, 561 U.S. at 389 (noting that the district court "did not simply take the venire members who proclaimed their impartiality at their word", that the

20

district court's questioning was adequate to "uncover concealed bias", and that provided the court sufficient "face-to-face opportunity to gauge demeanor and credibility.").[25]   Examining Skilling, the Fifth Circuit has noted that the district court's determinations there "were the 'culmination of a lengthy process' that included screening questionnaires, individual probing on the question of bias, repeated encouragements of candor, and the opportunity for counsel to ask follow-up questions."  Pratt, 728 F.3d at 471.

*C.*

Like their other motions, the defendants' motion for attorney-conducted individual voir dire targets the adequacy of the jury selection process and seeks to insure that the defendants are tried by an impartial jury.  At this stage of the proceedings, and given the confidence the Court has in the screening function of the juror questionnaires that will be used, the Court sees no reason to depart from its conventional voir dire procedures in favor of employing the likely more time-consuming voir dire process proposed by defense counsel.  The Court will initially screen venire members

---

[25] The Supreme Court in Skilling upheld the district court's denial of the defendant's request for attorney-led voir dire.  Although the district court indulged Skilling's request to examine each prospective juror individually, it denied Skilling's request for attorney-led voir dire because, in its experience, potential jurors were "more forthcoming" when the court, rather than counsel, asked the question.  Skilling, 561 U.S. at 389 (citation omitted). Counsel were permitted to ask follow-up questions of every prospective juror brought to the bench for colloquy.  Id.

by eliciting responses to a comprehensive jury questionnaire.  The proposed jury questionnaire (at present, including unresolved objections), which has been drafted jointly by defense counsel and counsel for the government, is a quite thorough 37 pages.  This questionnaire will identify prospective jurors excludable for cause and will facilitate the voir dire process.  Once the questionnaires have been completed and reviewed, the Court will assess to what extent the Court's conventional practice should be altered to probe the impact of pretrial publicity on prospective jurors' ability to be fair and impartial.  For now, the Court has not been persuaded that defense counsel is uniquely more qualified than the Court in ascertaining juror disqualifications, or that the Court must depart from its regular method.  However, during the oral hearing, defense counsel and counsel for the government suggested that the attorneys might be able to fashion a voir dire mechanism that suits this case and is agreeable to both sides.[26]  Accordingly, the motion is denied without prejudice.

* * *

Accordingly, for the foregoing reasons, the defendants' motion to vacate anonymous jury order, motion to change venue, and motion

---

[26] Whatever process counsel may agree to would permit counsel to ask questions targeted to uncover any concealed racial bias or otherwise probe any prejudicial impact of pretrial publicity, but would restrict counsel from advocacy.

for attorney-conducted individual voir dire are hereby DENIED, the
latter two without prejudice as premature.

New Orleans, Louisiana, October 19th, 2015

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE